TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-93-00650-CR







Paul Joseph Dugas, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 0925600, HONORABLE BOB PERKINS, JUDGE PRESIDING







PER CURIAM



 A jury found appellant guilty of capital murder. Act of April 16, 1985, 69th Leg., R.S.,
ch. 44, § 1, 1985 Tex. Gen. Laws 434 (Tex. Penal Code Ann. § 19.03(a)(2), since amended). 
The State having waived the death penalty, the district court assessed punishment at imprisonment
for life.

 On September 22, 1992, appellant drove from San Antonio to the Austin residence of
Aubrey and Joy McIntosh and their twenty-one year old daughter, Dierdre. In his car, appellant
had two .22 caliber semiautomatic pistols, extra clips, and about one hundred rounds of
ammunition. Appellant parked in front of the McIntosh house at approximately 8:00 a.m., got
out of his car with both pistols, walked into the carport, and began firing shots into the house. 
Two of these bullets struck Aubrey McIntosh as he sat at the breakfast table with Dierdre. 
Appellant then entered house through the side door and began shooting Dierdre.

 Seriously wounded, Aubrey McIntosh made his way to a bedroom where his wife was
getting dressed, attempted to call 911, and passed out. Joy McIntosh, realizing that her husband
had been shot and hearing appellant's attack on her step-daughter in the kitchen, escaped through
a window, went next door, and called the police.

 Meanwhile, appellant exhausted his supply of ammunition and walked back to his car for
the extra clips. When he returned to the kitchen, Dierdre McIntosh was on the telephone with the
911 operator. Appellant shot her several more times, killing her. He then went to his car and
waited for the police to arrive. In all, appellant fired twenty-three shots during his rampage at
the McIntosh residence. It was determined at autopsy that Dierdre McIntosh was struck by at
least twelve bullets and that seven of her wounds were lethal.

 Dierdre McIntosh met appellant in late 1989 and the two developed a romantic
relationship. Dierdre attempted to end the relationship in July 1992, when she moved back into
her parents' home. Aubrey and Joy McIntosh testified that appellant continually called Dierdre,
sometimes as often as six times a day, and often came to the house. Both Dierdre and her parents
told appellant to stop trying to call and visit, but to no avail. Aubrey McIntosh described
appellant's last telephone call, two days before the shooting: "He asked, he said, almost verbatim,
`Can I talk to your daughter?' I said, `No.' Said, `Can I talk to your daughter? I really want
to.' I said, `No.' He continued in this vein for at least 20 or 30 times just repeating again and
again, `I want to talk to your daughter. Can I talk to your daughter.'"

 In his own testimony, appellant denied engaging in the harassing behavior described by
the McIntoshes. According to appellant, he had attempted to end his relationship with Dierdre
McIntosh and it was she who harassed him. Appellant introduced in evidence a hand-printed
"slave contract" he said he received in the mail four days before the shooting. Appellant claimed
that the document had been sent to him by Dierdre McIntosh, although her name did not appear
on it and her father testified that the printing did not appear to be hers. Appellant testified that
the "slave contract" shocked him and caused him to feel trapped. According to appellant, he went
to the McIntosh residence on the morning of September 22 for the purpose of shooting the house. 
"I didn't know, I didn't have a conscious thought of her dad being there, or her stepmom, or
anything. I was shooting at the house. And the door came open, and the bullets were flying, and
she was in front of the doorway." Appellant said he "[s]tarted out shooting at the house,
eventually started shooting a wall, and shot her."

 In point of error four, appellant contends the district court erred by refusing to instruct the
jury on the lesser included offense of voluntary manslaughter. Penal Code, 63d Leg., R.S., ch.
399, sec. 1, § 19.03, 1973 Tex. Gen. Laws 883, 913, amended by Act of May 28, 1973, 63d
Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1124 (Tex. Penal Code Ann. §
19.04, since amended) (hereafter "section 19.04"). At the time of this offense, voluntary
manslaughter was a lesser included offense of capital murder if there was some evidence that the
murder was committed under the immediate influence of sudden passion arising from an adequate
cause. Sec. 19.04(a); Havard v. State, 800 S.W.2d 195, 216 (Tex. Crim. App. 1989). Appellant
argues that there is evidence showing that he was under "the emotional strain of Dierdre
McIntosh's obsessive nature" when he committed this offense. Appellant claims that when he
received the "slave contract," he "realized that Dierdre would never be willing to end their
relationship amicably." Under appellant's theory of the offense, he drove to the McIntosh house
"intending to shoot the house only," but when he saw Dierdre, "all the appellant could think about
was Dierdre's obsessive affection for him. The very sight of her provoked him to shot [sic] her
and everything around her, including Dierdre's father."

 We are unpersuaded by this argument, which is based more on speculation than on
evidence. There is no evidence that appellant, when he killed Dierdre McIntosh, was in the
immediate grip of anger, rage, resentment, or terror so great as to render him incapable of cool
reflection. Sec. 19.04(c). In the absence of evidence that appellant was under the influence of
sudden passion, no voluntary manslaughter issue was raised. Ojeda v. State, 712 S.W.2d 742,
744 (Tex. Crim. App. 1986). 

 Appellant contends that his homicidal conduct was the product of the "emotional strain of
Dierdre McIntosh's obsessive nature." We do not believe, however, that "obsessive affection"
of the sort McIntosh allegedly displayed toward appellant would commonly produce the requisite
level of emotion in a person of ordinary temper. Sec. 19.04(c). Moreover, the most recent
manifestation of McIntosh's purported obsession was the "slave contract" appellant claimed to
have received four days before the offense. Passion arising from former provocation is not
"sudden" and does not justify an instruction on voluntary manslaughter. Sec. 19.04(b); Marras
v. State, 741 S.W.2d 395, 405 (Tex. Crim. App. 1987); see Hobson v. State, 644 S.W.2d 473
(Tex. Crim. App. 1983) ("emotional crisis" brought on by defendant's concern over his
daughter's relationship with victim did not justify subsequent homicide). Appellant asserts that
the mere sight of Dierdre McIntosh on the morning of September 22 provoked his violent
outburst, but her presence in her own home was hardly a provocative act. Moreover, appellant
admitted that he began his assault on the McIntosh residence before he saw Dierdre. 

 Appellant committed an extraordinarily violent and senseless crime, but it does not follow
that the crime was one of passion as that term is used in section 19.04. There is no evidence in
the record that would permit a jury rationally to find that appellant murdered Dierdre McIntosh
under the immediate influence of sudden passion arising from an adequate cause. See Rousseau
v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993) (test for determining if defendant is
entitled to charge on lesser included offense). Point of error four is overruled. (1)

 The indictment in this cause alleged that appellant murdered Dierdre McIntosh in the
course of committing burglary. Appellant filed a motion to quash the indictment on the ground
that the State was improperly using the same act, the homicide, both as an element of the
underlying burglary and as the basis for the capital murder allegation. See Penal Code, 63d Leg.,
R.S., ch. 399, sec. 1, § 30.02, 1973 Tex. Gen. Laws 883, 926 (Tex. Penal Code Ann. §
30.02(a)(3), since amended) (burglary by entering and committing felony). This "bootstrapping"
argument has been presented to and rejected by the Court of Criminal Appeals. Fearance v.
State, 771 S.W.2d 486 (Tex. Crim. App. 1988) (capital murder in course of burglary); Barnard
v. State, 730 S.W.2d 703 (Tex. Crim. App. 1987) (capital murder in course of robbery). Point
of error five is overruled.

 In point of error three, appellant complains of the admission in evidence of a tape
recording of Dierdre McIntosh's telephone call to 911. On the tape, McIntosh moans, tells the
operator that she has been shot in the head, and pleads, "No Paul! Paul! No Paul . . ." These
words are followed by the sound of gunshots. Appellant argues that the recording was irrelevant
to any issue in the case and that the State sought to play the recording solely for its emotional
impact on the jury. Tex. R. Crim. Evid. 401, 402. Appellant further argues that to the extent
the tape was relevant, its relevance was outweighed by its unfairly prejudicial nature. Tex. R.
Crim. Evid. 403.

 The State argues, as it did at trial, that the tape was relevant to show that the fatal shots
were fired inside the house and therefore to demonstrate that appellant committed the underlying
burglary. Appellant, anticipating this argument, asserts that it was undisputed that he entered the
house and that the recording therefore did not contribute to the resolution of any contested issue. 
Appellant relies on the opinion in Brown v. State, 757 S.W.2d 739 (Tex. Crim. App. 1988). 
Brown was a prosecution for sexual assault in which the defense was alibi. The State was
permitted to offer evidence at the guilt stage that, since the assault, the victim had twice attempted
suicide and otherwise manifested emotional trauma. The court held that because there was no
dispute that the victim had been sexually assaulted and that this had been a traumatic event, the
evidence regarding her emotional reaction to the assault was irrelevant to any issue at the guilt
stage.

 We believe this cause is distinguishable from Brown. Beginning with defense counsel's
opening remarks during jury selection, the strategy of the defense was to convince the jury that
appellant did not commit or attempt to commit burglary and therefore was guilty of, at most,
murder. Although appellant did not deny entering the house, he did dispute the allegation that he
entered without effective consent. Appellant testified that Dierdre McIntosh opened the door for
him on the morning in question. During final argument, defense counsel urged that appellant
"was invited inside that house." The tape recording was relevant not only to prove that appellant
entered the house, but also to prove that he did so without Dierdre McIntosh's consent. 

 We will not disturb the district court's decision to admit the tape recording absent a
showing that the court abused its discretion. Tex. R. Crim. Evid. 104(a); Montgomery v. State,
810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (opinion on motion for rehearing). Because we
find that the recording was relevant to an issue of consequence at trial, the district court did not
abuse its discretion by overruling appellant's relevance objection. Further, given the centrality
of the burglary question at trial, we believe that the court did not abuse its discretion by
determining that the relevance of the recording outweighed its potential for unfair prejudice. See
Montgomery, 810 S.W.2d at 391-93 (criteria for reviewing Rule 403 determination). Point of
error three is overruled.

 In point of error one, appellant contends the district court erred by overruling his objection
to a reference to appellant invoking his right to remain silent during police interrogation. Austin
police officer Daniel Zahara testified that a card was found in appellant's wallet on which was
written, "I'll show you fear in a handful of dust." During cross-examination, Zahara was asked
by defense counsel:


Q: Now, what's just been passed to the jury, that little note that was found in
Mr. Dugas' wallet, do you know what it is?


A: I have no idea.


Q: Have you even inquired what it is?


A: I was unable to ask him because he invoked his right.



Counsel approached the bench and, outside the hearing of the jury, objected to the officer's
reference to appellant invoking his right to silence. The district court overruled the objection on
the ground that "the answer he gave was within the . . . boundaries of the question you asked." 
In an abundance of caution, however, the court instructed the jury to disregard the officer's
statement. This instruction was sufficient to cure any error. Franklin v. State, 693 S.W.2d 420,
428-29 (Tex. Crim. App. 1985). Point of error one is overruled.

 Finally, appellant complains of the district court's failure to grant a mistrial after the
prosecutor remarked, during closing argument, that appellant "was lying like a dog" during his
testimony. Although the court refused to grant a mistrial, appellant's objection was sustained and
the jury was instructed to disregard the comment.

 When a defendant's testimony is in obvious conflict with the State's evidence, it is not
error for the prosecutor to argue that the accused was not telling the truth. Simpkins v. State, 590
S.W.2d 129, 136 (Tex. Crim. App. 1979). We agree with the State that the prosecutor was using
a colloquialism and was not, as appellant would have it, calling appellant a dog. In any event,
any error was cured by the instruction to disregard. Long v. State, 823 S.W.2d 259, 270 (Tex.
Crim. App. 1991). Point of error two is overruled.

 

 The judgment of conviction is affirmed.


Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: February 15, 1995

Do Not Publish


1. At the conclusion of his argument under this point of error, appellant's brief contains two
paragraphs under the subheading "adequate and independent state law grounds." Appellant urges
that if we conclude that his conviction "need not be reversed on due process grounds, the Texas
constitutional protection of due course of law mandates the reversal of his conviction." So far as
we are aware, the question whether appellant was entitled to an instruction on the lesser offense
of voluntary manslaughter is strictly a question of state law and we have decided the issue on that
basis.